UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN CARROLL, GABRIEL MOLINA and all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>QUEST DIAGNOSTICS, INC., d/b/a QUEST HEALTH, INC., THE QUEST COMPANIES, AMERICAN MEDICAL COLLECTION AGENCY AND OPTUM360, OPTUM, INC., UNITED HEALTH GROUP,<br><br>　　　　　　Defendants. | Civ. No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY** |

## CLASS ACTION COMPLAINT

Plaintiff John Carroll ("Carroll") and Plaintiff Gabriel Molina ("Molina"), or "Plaintiffs," allege the following, upon personal knowledge with respect to themselves, and upon information and belief derived from, among other things, investigation of counsel and review of public documents, as to all other matters:

## NATURE OF THE CASE

1.　This is a class action on behalf of the millions of customers of Quest Diagnostics, Inc. ("Quest"), American Medical Collection Agency ("AMCA"), and Optum360, including Optum Inc., and United Health Group ("Optum") (Quest, AMCA, and Optum are collectively referred to as "Defendants") whose personal health information ("PHI") and/or personally identifiable information ("PII") were disclosed to one or more criminal actors in what is one of the largest consumer data security breaches in the medical field's history. Plaintiffs seek relief on behalf of all consumers in the United States who had their PHI and/or PII stolen as a result of the

breach. Plaintiffs also seek relief under New York law on behalf of the millions of customers of Quest in New York who had their PHI and/or PII stolen.

2. Quest Diagnostics is the world's leading provider of diagnostic testing, information, and services.

3. On June 3, 2019, Quest announced that hackers had breached its systems and stolen the personal and financial information of up to twelve (12) million Quest Diagnostics plan customers, former customers, and employees.

4. Defendants have yet to notify its customers individually regarding what specific data of theirs were stolen, telling them that such notification may take weeks. Defendants have nevertheless advised that the data stolen included credit card numbers, bank account information, medical information and Social Security numbers.

5. This theft occurred because of Quest's failure to take reasonable measures to ensure its data systems, including those of its collection agency, AMCA, and Optum360 were adequate to protect the sensitive personal data of its customers and former customers. Among other things, Quest failed to implement data security measures designed to prevent this attack despite repeated warnings to the healthcare industry and Quest about the risks of such cyber-attacks, failed to employ security protocols to detect the unauthorized network activity, failed to maintain basic security measures such as complex data encryption so that data that were accessed or stolen would be unreadable, failed to disclose to its customers the material facts that it did not have adequate computer systems and data security practices to safeguard customers' personal data, and failed to provide immediate and accurate notice of the data breach to its customers. These failures have injured Plaintiffs and the Class.

6.  Plaintiff John Carroll is a Quest Diagnostics customer and currently utilizes its services in New York. Like millions of other Quest customers, Plaintiff's PHI and/or PII have been stolen.

7.  Plaintiff Gabriel Molina is a Quest Diagnostics customer and currently utilizes its services in New Jersey. Like millions of other Quest customers, Plaintiff's PHI and/or PII have been stolen.

8.  Quest's failure and breach are egregious, and Quest is liable because of its "Forced Payment" requirement imposed on all customers.

9.  For each of its lab tests, Quest requires the customer to provide a credit card, and an authorization for a specific amount related to the test is obtained. This process occurs regardless of the customer's insurance, co-pay, out of pocket, or deductible amount. As a result, Quest forces all its customers to provide their credit card information.

10. Because of Defendants' negligence, some 12 million customers had their personal information, including at least credit card numbers, bank account information, medical information and Social Security numbers, stolen by criminal hackers.

11. The information obtained as a result of the conduct complained of herein is a treasure trove for identity thieves who use it to gain access to every aspect of a victim's life, or worse, to create a new life using the victim's identity.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332 (a) and 1332 (d), because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two-thirds of the members of the Class are citizens of states different from that of Defendants.

13. Venue lies in this Court pursuant to 2 U.S.C. § 1391 because many of those affected by Defendants' wrongful conduct reside in this District, and many of the potential witnesses reside and work in this District. Moreover, Defendant AMCA maintains its headquarters in and operates its national business from this District.

## THE PARTIES

14. John Carroll is a resident of New York and utilizes Quest Diagnostics' services currently and since the beginning of 2000 and, upon information and belief and Quest's statements to all of its customers, Plaintiff Carroll had at least his PII and possibly his PHI data stolen as a result of the Quest data breach.

15. Gabriel Molina is a resident of New Jersey and utilizes Quest Diagnostics' services currently and since the beginning of 2000 and, upon information and belief and Quest's statements to all of its customers, Plaintiff Molina had at least his PII and possibly his PHI data stolen as a result of the Quest data breach.

16. Defendant Quest Diagnostics, Inc., doing business as Quest Diagnostics, is a New Jersey corporation headquartered in Secaucus, New Jersey.

17. Defendant American Medical Collection Agency is a corporation headquartered in Elmsford, NY. Defendant AMCA is a billings collections service provider that provides billing collections services to Optum360.

18. Defendant Optum360, LLC is a limited liability company with headquarters in Minnesota and is part of Optum Inc and UnitedHealth Group. Defendant Optum360 provides billing collections services to Quest.

19. Collectively, the Defendants and all closely linked and intertwined businesses are responsible for the retention, storage, and protection of Plaintiffs' and Class members' PHI and PII.

## FACTUAL ALLEGATIONS

20. Quest is one of the largest for-profit diagnostic service providers in the world. Quest has an obligation to maintain the security of its customers' and former customers' personal, health, and financial information, and to notify them immediately and accurately when there is a breach of its systems to protect them, and to allow them to protect themselves, from identify theft and other misuse of their personal data.

21. Quest's Notice of Privacy Policy, which is provided to customers, states Quest is committed to protecting customers' PHI:

> Quest Diagnostics and its wholly owned subsidiaries (collectively "Quest Diagnostics") are committed to protecting the privacy of your identifiable health information. This information is known as "protected health information" or "PHI." PHI includes laboratory test orders and test results as well as invoices for the healthcare services we provide.
>
> We exercise great care to protect your personal information. This includes, among other things, using industry standard techniques such as firewalls, encryption, and intrusion detection. As a result, while we strive to protect your personal information, we cannot ensure or warrant the security of any information you transmit to us or receive from us. This is especially true for information you transmit to us via email since we have no way of protecting that information until it reaches us since email does not have the security features that are built into our websites.
>
> In addition, we limit Quest Diagnostics' employees and contractors' access to personal information. Only those employees and contractors with a business reason to know have access to this information. We educate our employees about the importance of maintaining confidentiality of customer information.
>
> We review our security arrangements from time to time as we deem appropriate.

22. Quest's website also contains the following privacy policy, which acknowledges the sensitive nature of the information that was stolen and acknowledges its commitment to safeguarding such information.

23. The Health Insurance and Portability and Accountability Act ("HIPAA") and implementing regulations require Quest to establish procedures to keep secure any confidential

and private PHI and PII it maintains on enrollees and members including, without limitation, names and Social Security numbers. 45 C.F.R. § 164.530(c)(l) requires healthcare providers, including Quest, to implement reasonable safeguards for such information, which Quest failed to do. 45 C.F.R. § 164.404 requires that companies provide notice of any breach resulting in access to unsecured protected health information, which includes protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons -- i.e., non-encrypted data. See C.F.R. § 164.402. Quest failed to provide such notice.

**QUEST KNEW ITS CUSTOMERS' PHI AND PII WERE LIKELY TO BE TARGETED**

24. Because of the wealth of information stored on their systems, healthcare providers, such as Quest, are aware that they are, and will be, a frequent target of attacks on data security.

25. According to a report issued by the credit reporting company Experian, "[t]he healthcare industry, by far, will be the most susceptible to publicly disclosed and widely scrutinized data breaches." Available at http://www.experian.com/data-breach/data-breach-industry-forecast.html (last visited February 13, 2015). According to the Indianapolis Star: "Security experts knew it was not a matter of whether a major breach would occur in the health-care industry, but when."[1]

26. The New York Times reports that "[t]he threat of a hacking is particularly acute in the health care and financial services industries, where companies routinely keep the most sensitive personal information about their customers on large databases." *See* Reed Abelson & Matthew Goldstein, Millions of Quest Customers Targeted in Cyberattack, N.Y. Times (Feb. 10, 2015),

---

[1] https://search.yahoo.com/yhs/search;_ylt=A0LEVi9.W95UJJUAKYUnnllQ?ei=UTF-8&hsimp=yhs001&hspart=mozilla&p=Quest+data+breach+information+more+valuable&Spell State=&fr2=sp-qrw-corr-top.

http://www.nytimes.com/2015/02/05/business/hackers-breached-data-of-millions-insurer-says.html.

27. In fact, the type of data stored by healthcare providers, and stolen as part of the Quest data breach, is far more valuable to identity thieves than credit card and other PII stolen from retailers and other companies that store customer information. This is because a credit card can be easily cancelled or replaced. A social security number cannot.

28. The type of information stored by Defendants allows thieves to open many financial/banking accounts in victims' names and, in some cases, to file fake tax returns in victims' names -- a common fraud.

29. Not as commonly known, medical records command a high value on the Dark Web, as these records can be listed up to ten (10) times more than the data from an average credit card breach because there is more personal information in health records than any other electronic database. Providers like Quest must be hypervigilant in ensuring that patient data are protected and that outside vendors and businesses do not access patients' information.

30. Quest announced that, on or about May 14, 2019, it detected a massive data breach that compromised the PII and/or PHI of approximately 11.9 million insured and formerly insured individuals.

31. Quest's billing and collections subcontractor, AMCA, reported intruders had hacked into its system, thereby gaining access to Quest's patients' financial data, Social Security numbers, and medical data.

32. Quest is permitted to share with AMCA, as a subcontractor, sensitive patient data. In turn, Quest must conduct proper due diligence of AMCA to ensure that its subcontractor maintains the necessary and proper security programs to safeguard such patient information.

33. Quest was required to have a risk stratification process as part of its oversight of its subcontractor that allowed it to evaluate and monitor the efforts of AMCA, which maintains large amounts of sensitive patient data, to protect patient information.

34. Quest wholly failed to implement such a risk stratification process and also to oversee and verify that AMCA secured and maintained the necessary security programs to protect its patients' data as evidenced by Quest's public statement that: "AMCA has not yet provided Quest or Optum 360 detailed or complete information about the AMCA data security incident, including which information of which individuals may have been affected. And Quest has not been able to verify the accuracy of the information received from AMCA."

35. The Wall Street Journal first broke the news publicly of a breach to Quest's systems. http://www.wsj.com/articles/health-insurer-Quest-hit-by-hackers-1423103720

36. Quest has, to date, failed to inform individual customers of the specific information that has been stolen, and it has not informed people whether banking information, such as credit or debit card numbers and account numbers, or sensitive medical information were stolen as a result of the breach.

37. The vague and conclusory nature of the information that Quest has provided to its customers to date, and the fact that Quest has told consumers that it may take up to several weeks for the Company to inform them if their PHI and/or PII was compromised, has led Attorneys General from ten (10) states to question Quest's handling of the breach publicly.

38. Quest's actions have greatly increased the risk that its patients will be imminently targeted by identity thieves.

39. The Federal Trade Commission describes identity theft as: "when someone steals your personal information and uses it without your permission," and further describes it as "a

serious crime that can wreak havoc with your finances, credit history, and reputation - and can take time, money, and patience to resolve." http://www.consumer.ftc.gov/features/feature-0014-identity-theft.

40. According to the FTC: "Once identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance. An identity thief can file a tax refund in your name and get your refund. In some extreme cases, a thief might even give your name to the police during an arrest." http://www.consumer.ftc.gov/articles/0271-signs-identity-theft.

41. In May 10, 2006, President Bush established the President's Task Force on Identity Theft ("Task Force"), "recognizing the heavy financial and emotional toll that identity theft exacts from its victims, and the severe burden it places on the economy."

42. The Task Force's report recognizes that "individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration."

43. The unauthorized disclosure of Social Security Numbers can be particularly damaging because Social Security Numbers cannot easily be replaced. In order to obtain a new number, a person must prove, among other things, that he or she continues to be disadvantaged by the misuse. Thus, no new number can be obtained until after the damage has been done. Further, as the Social Security Administration ("SSA") warns:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal

> information, credit reporting companies use the number to identify your credit record. So, using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make more difficult for you to get credit.

SSA, Identity Theft and Your Social Security Number, SSA Publication No. 05-10064 (Dec. 2013), available at http://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Feb. 11, 2015).

44. Thanks to Defendants' failure to protect their sensitive information, Plaintiffs and the Class now face years of looking over their financial shoulders, monitoring their credit reports, paying for identity theft protection, and general anxiety about their financial well-being.

## CLASS ACTION ALLEGATIONS

45. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 defined as follows:

> All persons in the United States whose PII was stored on the Quest system, and who have had their PII information exposed during the security breach, announced on June 3, 2019 and were or may be damaged ("Nationwide Class").

46. Excluded from the class are Defendants, any parents, subsidiaries, or affiliates of Defendants or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of Defendants, any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer as defined in 28 U.S.C. §455(b).

47. Plaintiff Caroll also brings this action pursuant to New York law on behalf of himself and all other persons similarly situated pursuant to Fed. R. Civ. P. 23 defined as follows:

> All persons in New York whose PII was stored on the Quest system, and who have had their PII exposed during the security breach, announced on June 3, 2019 and were or may be damaged ("New York Class").

48. Excluded from the Class are Defendants; any parents, subsidiaries, or affiliates of Defendants or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of Defendants; and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer, as defined in 28 U.S.C. § 455(b).

49. <u>Numerosity</u>. The Class members are so numerous and dispersed nationwide that joinder of all members is impracticable. Upon information and belief, the Class members number in the tens of millions. The exact number of Class members is unknown but can be determined from Defendants' computerized and other records. Plaintiff reasonably estimates and believes that there are millions of persons in the Class.

50. <u>Commonality</u>. There are numerous and substantial questions of law and fact that are common to all members of the Class, which predominate over any questions affecting only individual Class members. The members of the Class were and continue to be subjected to the same practices of the Defendants. The common questions and issues raised by Plaintiffs' claims include:

(a) whether Defendants acted negligently in failing to safeguard Class members' financial and personal data properly;

(b) whether Defendants' conduct constituted bailment;

(c) whether Defendants violated industry standards concerning the handling and storage of Class members' financial and personal data;

(d) whether Defendants failed to notify Class members of the security breach as soon as practicable after the breach was discovered;

(e) whether Defendants engaged in unfair practices by failing to safeguard customers' financial and personal data properly;

(f) whether Defendants violated New York General Business Law § 899-aa;

(g) whether Plaintiffs and the Class have been damaged, and, if so, what types of damages flow from Defendants' unlawful conduct; and

(h) the appropriate measure of damages and remedies against Defendants and the nature and extent of any other remedies, and injunctive relief, to which Plaintiffs and the Class are entitled.

51. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of all other members of the Class because their claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendants.

52. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of all members of the Class in the prosecution of this Action and in the administration of all matters relating to the claims stated herein. Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the Class they seek to represent. Plaintiffs have retained counsel experienced in handling class action lawsuits. Neither Plaintiffs nor their counsel have any interest that might cause them not to pursue this action vigorously.

53. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual joinder of the Class members is impracticable. Even if individual Class members were able to afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigations would proceed. Defendants have subjected the Class to the same violations referenced herein. Accordingly, class certification is appropriate under Rule 23 because common issues of law and fact regarding Defendants'

uniform violations predominate over individual issues, and class certification is a superior method of resolving these claims. No unusual difficulties are likely to be encountered in the management of this action as a class action. Defendants acted and continue to act in a manner that is generally applicable to all members of the Class, making final injunctive relief appropriate.

## COUNT I

### NEGLIGENCE
### (On Behalf of the "Nationwide Class")

54. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

55. Defendants owed a duty to Plaintiffs and members of the Class to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their personal, health, and financial information in Defendants' possession from being compromised, lost, stolen, accessed, and/or misused by unauthorized persons. This duty included, among other things, designing, maintaining, and testing Defendants' security systems to ensure that Plaintiffs and Class members' personal, health, and financial information in Defendants' possession was adequately secured and protected. Defendants further owed a duty to Plaintiffs and Class members to implement processes that would detect a breach of its security system in a timely manner and to act upon warnings and alerts in a timely manner.

56. Defendants owed a duty, as articulated in Quest's HIPAA Notice of Privacy Practices, to protect their customers' sensitive financial, health, and personal information.

57. Defendants owed a duty to disclose the material fact that Defendants' computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft in a timely manner.

58. Defendants breached these duties by the conduct alleged in the Complaint including, without limitation, (a) failing to protect their customers' personal, financial, and health information; (b) failing to maintain adequate computer systems and data security practices to safeguard customers' personal, health, and financial information; (c) failing to disclose the material fact that Defendants' computer systems and data security practices were inadequate to safeguard customers' personal and financial data from theft; and (d) failing to disclose in a timely and accurate manner to Plaintiffs and members of the Class the material fact of the Quest data breach.

59. The conduct alleged in the Complaint caused Plaintiffs and Class members to be exposed to fraud and be harmed. The injuries suffered by the Plaintiffs and the proposed Class as a direct result of the Quest data breach include: theft of their personal and financial information; costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the data breach, including: finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all of the issues resulting from the Quest data breach; the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their personal and financial information being placed in the hands of hackers; damages to and diminution in value of their personal and financial information entrusted to Quest for the sole purpose of obtaining health insurance from Quest and with the mutual understanding that Quest would safeguard Plaintiffs' and Class members' data against theft and not allow access and misuse of their data by others; money paid

to Quest for services during the period of the Quest data breach in that Plaintiffs and Class members would not have obtained services from Quest had Quest disclosed that it lacked adequate systems and procedures to safeguard customers' financial and personal information and had Quest provided timely and accurate notice of the Quest data breach; overpayments paid to Quest for services purchased during the Quest data breach in that a portion of the price for services paid by Plaintiffs and the Class to Quest was for the costs of Quest providing reasonable and adequate safeguards and security measures to protect customers' financial and personal data, which Quest did not do, and as a result, Plaintiffs and members of the Class did not receive what they paid for and were overcharged by Quest; and continued risk to their financial and personal information, which remains in the possession of Quest and which is subject to further breaches as long as Quest fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class members' data in its possession.

## COUNT II

### BREACH OF IMPLIED CONTRACT
### (On Behalf of the "Nationwide Class")

60. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

61. When Plaintiffs and members of the Class provided their financial, health, and personal information to Quest in order to purchase services from Quest, Plaintiffs and members of the Class entered into implied contracts with Quest pursuant to which Quest agreed to safeguard and protect such information and to notify individually Plaintiffs and Class members that their data had been breached and compromised in a timely and accurate manner.

62. Plaintiffs and Class members would not have provided and entrusted their financial, health, and personal information to Quest in order to purchase health insurance from Quest in the absence of the implied contract between them and Quest.

63. Plaintiffs and members of the Class fully performed their obligations under the implied contracts with Quest.

64. Quest breached the implied contracts it made with Plaintiffs and Class members by failing to safeguard and protect the personal, health, and financial information of Plaintiffs and members of the Class and by failing to provide timely and accurate notice to them that their personal and financial information was compromised in and as a result of Quest data breach.

## COUNT III

### BREACH OF CONTRACT (AS TO QUEST ONLY)
### (On Behalf of the "Nationwide Class")

65. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

66. Quest has a contractual obligation to maintain the security of its customers' personal, health, and financial information, which Quest itself recognizes in its HIPAA Notice of Privacy Practices where it addresses the consumers "protected health information" or "PHI."

67. Quest breached these contractual obligations by failing to safeguard and protect the personal, health, and financial information of Plaintiffs and members of the Class and by failing to provide timely and accurate notice to them that their personal and financial information was compromised in and as a result of Quest data breach.

68. The losses and damages sustained by Plaintiffs and Class members as described herein were the direct and proximate result of Quest's breaches of the contracts between Quest and Plaintiffs and members of the Class.

## COUNT IV

### BAILMENT (AS TO QUEST ONLY)
### (On Behalf of the "Nationwide Class")

69. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

70. Plaintiffs and Class members delivered and entrusted their PHI and PII to Quest for the sole purpose of receiving services from Quest.

71. In delivering their PHI and PII to Quest, Plaintiffs and Class members intended and understood that Quest would adequately safeguard their personal and financial information.

72. Quest accepted possession of Plaintiffs and Class members' PHI and PII. By accepting possession, Quest understood that Plaintiffs and Class members expected Quest to safeguard their personal and financial information adequately. Accordingly, a bailment was established for the mutual benefit of the parties.

73. During the bailment, Quest owed a duty to Plaintiffs and Class members to exercise reasonable care, diligence, and prudence in protecting their PHI and/or PII.

74. Quest breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class members' PHI and/or PII, resulting in the unlawful and unauthorized access to and misuse of such information.

75. Quest further breached its duty to safeguard Plaintiffs' and Class members' PHI and/or PII by failing to notify them individually that their information had been breached and compromised in a timely and accurate manner.

76. As a direct and proximate result of Quest's breach of its duty, Plaintiffs and Class members suffered consequential damages that were reasonably foreseeable to Quest, including but not limited to the damages set forth above.

## COUNT V

**UNJUST ENRICHMENT**
**(On Behalf of the "Nationwide Class")**

77. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

78. Plaintiffs and Class members conferred a monetary benefit on Quest in the form of monies paid for the purchase of health services from Quest during the period of the data breach.

79. Quest appreciates or has knowledge of the benefits conferred directly upon it by Plaintiffs and members of the Class.

80. The monies paid for the purchase of health services by Plaintiffs and members of the Class to Quest during the period of the data breach were supposed to be used by Quest, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and members of the Class.

81. Quest failed to provide reasonable security, safeguards and protection to the PHI and/or PII of Plaintiffs and Class members and as a result, Plaintiffs and Class members overpaid Quest for the services purchased.

82. Under principles of equity and good conscience, Quest should not be permitted to retain the money belonging to Plaintiffs and members of the Class, because Quest failed to provide adequate safeguards and security measures to protect Plaintiffs and Class members' PHI and PII that they paid for but did not receive.

83. Plaintiffs and the Class have conferred directly upon Quest an economic benefit in the nature of monies received and profits resulting from sales and unlawful overcharges to the economic detriment of Plaintiffs and the Class members.

84. The economic benefit, including the monies paid and the overcharges and profits derived by Quest and paid by Plaintiffs and members of the Class, is a direct and proximate result of Quest's unlawful practices as set forth in this Complaint.

85. The financial benefits derived by Quest rightfully belong to Plaintiffs and members of the Class.

86. A constructive trust should be imposed upon all unlawful or inequitable sums received by Quest traceable to Plaintiffs and the Class.

87. Plaintiffs and the Class have no adequate remedy at law.

## COUNT VI

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 899-aa
### (On Behalf of the "New York Class")

88. Plaintiffs fully incorporate by reference all of the above paragraphs, as though fully set forth herein.

89. The acts and practices alleged herein occurred in trade or commerce in the State of New York.

90. The Quest data breach, which compromised the personal information, including the Social Security numbers, of New York citizens constitutes a "breach of security," as that term is defined by NY Gen. Stat.§ 899-aa.

91. In the manner described herein, the defendants unreasonably delayed the disclosure of the breach of security of personal information within the meaning of NY. Gen. Stat. § 899-aa.

92. Pursuant to NY. Gen. Stat. § 89-9aa the Defendants' failure to disclose the breach following the discovery to each New York resident whose personal information was, or was reasonably believed to have been, accessed by an unauthorized person through the breach constitutes an unfair trade practice pursuant to NY. Gen. Stat. § 899-aa.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs John Carroll and Gabriel Molina, on behalf of themselves and the Class, requests the following relief:

A.  An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed as Class Representative, and that Plaintiffs' counsel be appointed Class Counsel;

B.  An award of damages;

C.  Restitution of all monies unjustly obtained or to be obtained from Plaintiffs and members of the Class;

D.  Disgorgement of revenues obtained by Defendants as a result of the misconduct alleged herein;

E.  Declaratory and injunctive relief;

F.  An award of reasonable attorneys' fees and costs; and

G.  Such other relief at law or equity as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial of their claims by jury to the extent authorized by law.

DATED:  July 30, 2019                                Respectfully submitted,

                                                     MILBERG PHILLIPS GROSSMAN LLP

                                                     _____
                                                     Leigh Smith
                                                     One Pennsylvania Plaza, Suite 1920
                                                     New York, New York 10119-0165
                                                     Telephone: (212) 594-5300
                                                     Facsimile:  (212) 868-1229
                                                     E-Mail: lsmith@milberg.com